**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                 No. 98-4155

ROGER WINFRED STEWART,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                 No. 98-4177

DENNEVER LIVINGSTON, a/k/a Fatta,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

JUNIOR ANTHONY SIMMS, a/k/a
                                                                   No. 98-4192
Glandan Steve Lynch, a/k/a Steve
Brown, a/k/a Leroy Sims, a/k/a Eric
Brooks, a/k/a "Tallest," a/k/a
"Sammo," a/k/a Mike Smith,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry C. Morgan, Jr., District Judge.
(CR-97-39)

Argued: December 5, 2000

Decided: July 6, 2001

Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Williams wrote the opinion, in which Judge Michael and Judge Motz joined.

_____

## COUNSEL

**ARGUED:** Samuel Warrenton Meekins, Jr., WOLCOTT, RIVERS, WHEARY, BASNIGHT & KELLY, P.C., Virginia Beach, Virginia, for Appellant Livingston; Christopher Ford Cowan, COWAN, NORTH & LAFRATTA, L.L.P., Richmond, Virginia, for Appellant Stewart; Charles Russell Burke, Virginia Beach, Virginia, for Appellant Simms. Fernando Groene, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** David M. Bastiaans, WOLCOTT, RIVERS, WHEARY, BASNIGHT & KELLY, P.C., Virginia Beach, Virginia, for Appellant Livingston. Helen F. Fahey, United States Attorney, Sharilyn Yountz, Third Year Law Student, Norfolk, Virginia, for Appellee.

_____

## OPINION

WILLIAMS, Circuit Judge:

In these consolidated appeals, Roger Winfred Stewart, Dennever Livingston, and Junior Anthony Simms (collectively,"Appellants"), raise numerous challenges to their convictions and sentences following a federal jury trial in which each was found guilty of various charges related to money laundering and/or drug trafficking.[1] Finding

_____

[1] Forty-three persons were included in the indictment. Of those, only four pleaded not guilty and went to trial. The fourth co-defendant, Richard Willis Teagle, became seriously ill and was granted a mistrial for health reasons.

2

no reversible error with respect to Simms, we affirm his convictions and sentences. However, we vacate Stewart's convictions, sentences, and assessments due to improper venue. We also remand for the district court to vacate Livingston's substantive money laundering convictions under Counts 115-120 as multiplicitous and to strike any assessments applicable to those counts. We affirm the remainder of Livingston's convictions and sentence.

I.

A.

From 1991 through 1997, Stewart, Livingston, and Simms were involved in various roles in the bi-coastal distribution of large quantities of marijuana. Livingston obtained marijuana in Los Angeles, California from Mexican suppliers and shipped it to cities in the Eastern District of Virginia and elsewhere via overnight courier. Simms was one of the conspirators who retrieved the marijuana in Virginia and repackaged and redistributed it to wholesalers. Once the marijuana was distributed, Simms, along with other conspirators, collected the drug proceeds and sent them back to Livingston in Los Angeles, via Western Union money transfers and in parcels sent by overnight courier.

Livingston recruited various persons, including Stewart, to receive the wire transfers and money parcels in Los Angeles. From February 1994 to March 1997, Stewart received 136 Western Union wire transfers in Los Angeles totaling $345,840. Additionally, from October 1995 to April 1997, Stewart received 56 parcels of overnight mail in Los Angeles containing money from drug proceeds. After receiving the packages and money from Western Union, Stewart would deliver the packages and money to Livingston.

B.

In April 1997, Stewart, Livingston,[2] and Simms were indicted in

_____

[2] At the time of the indictment, the Government was unaware of Livingston's true identity and referred to him in the indictment as John Doe a/k/a "Fatta." Upon discovering Livingston's identity, the Government arrested him in August 1997, he was arraigned in September 1997, and on October 20, 1997, Livingston was ordered to be tried with Stewart and Simms.

the United States District Court for the Eastern District of Virginia on the following charges: (1) conspiracy to possess with the intent to distribute and distribution of more than one thousand kilograms of marijuana, in violation of 21 U.S.C.A. § 841(a)(1) (West 1999) and § 846 (West 1999 & Supp. 2000); (2) conspiracy to engage in money laundering, in violation of 18 U.S.C.A. § 1956(h) (West 2000); and (3) money laundering to promote and disguise drug trafficking, in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (West 2000). Under the same indictment, Livingston and Simms were charged with money laundering to promote and disguise drug trafficking, in violation of 18 U.S.C.A. § 1956(a)(1)(B)(i) (West 2000). Livingston and Simms also were charged with possession with intent to distribute marijuana, in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2 (West 2000), and Simms was indicted on a charge of engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C.A. § 848 (West 1999 & Supp. 2000), and on charges of illegal use of a communication device, in violation of 21 U.S.C.A. § 843(b) (West 1999 & Supp. 2000), and 18 U.S.C.A. §§ 2 & 3237(a) (West 2000). In July 1997, Simms was indicted on one count of attempted possession with intent to distribute cocaine, in violation of 18 U.S.C.A. § 2, one count of possession with intent to distribute cocaine, in violation of 21 U.S.C.A. § 841(a)(1), and three counts of knowingly carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C.A. § 924(c)(1) (West 2000).

Following a jury trial that began on October 20, 1997 and concluded on November 13, 1997, Stewart was found guilty of eleven counts of money laundering to promote and disguise drug trafficking and was found not guilty of all conspiracy charges. Livingston was found guilty of one count of conspiracy to possess with intent to distribute marijuana, one count of possession with intent to distribute marijuana, one count of conspiracy to launder money, and twelve counts of money laundering to promote and disguise drug trafficking. Simms was found guilty of one count of conspiracy to possess marijuana with the intent to distribute, one count of operating a CCE, one count of conspiracy to launder money, forty-six counts of money laundering to promote and disguise drug trafficking, four counts of illegal use of a communication device, six counts of possession with intent to distribute marijuana, and three counts of knowingly carrying a firearm during and in relation to a drug trafficking offense. Simms

4

was found not guilty of attempting to possess with intent to distribute cocaine and of possession with intent to distribute cocaine, and, on Simms's motion prior to the jury's verdict, the district court dismissed one count of illegal use of a communication device.

Stewart was sentenced to concurrent sentences of 135 months imprisonment on each of his eleven money laundering convictions. Stewart received three years of supervised release and was ordered to pay a special assessment of $950.00. Livingston was sentenced to 360 months imprisonment, consisting of concurrent sentences of 360 months on his conviction for conspiracy to possess marijuana with intent to distribute and 240 months on each of his other convictions. Livingston received ten years of supervised release and was ordered to pay a special assessment of $1,500. Simms was sentenced to 832 months imprisonment, consisting of 292 months for operating a CCE, 60 months for one count of carrying a firearm during and in relation to a drug trafficking offense, and 240 months each for the remaining two counts of carrying a firearm during and in relation to a drug trafficking offense, all of which were imposed consecutively. Simms's term of imprisonment also consisted of 292 months on the conspiracy to launder money charge, 240 months on each of Simms's forty-six convictions for money laundering to promote and disguise drug trafficking, 48 months on each of his four convictions for illegal use of a communications device, 60 months on each of his five convictions for possession with intent to distribute marijuana, and 240 months on Simms's final conviction for possession with intent to distribute marijuana, all of which were imposed concurrently. Simms received five years of supervised release and was ordered to pay a special assessment of $4,800.

Stewart, Livingston, and Simms filed their notices of appeal on February 26, February 27, and February 28, respectively, from their convictions and sentences. On March 11, 1998, we consolidated these appeals.

On appeal, Stewart challenges his money laundering convictions on several grounds, including improper venue. Livingston challenges the district court's refusal to grant Livingston a mistrial, its denial of his motion to dismiss for improper venue, its denial of his motion for continuance, the district court's refusal to strike one set of money

5

laundering counts as multiplicitous, the sufficiency of the evidence as to money laundering, the sufficiency of the evidence as to possession with intent to distribute marijuana, the sufficiency of the evidence as to conspiracy to possess with intent to distribute marijuana, whether the district court violated Apprendi v. New Jersey, 530 U.S. 466 (2000), by failing to instruct the jury that it had to determine drug quantity and type beyond a reasonable doubt, whether the district court erred in computing drug weights when determining Livingston's base offense level, and whether the district court erred by applying a two level enhancement for obstruction of justice. Simms argues that his CCE conviction should be reversed because the district court failed to instruct the jury that they were required to agree unanimously on the specific violations comprising the"continuing series of violations" of the CCE. Simms also argues that his CCE conviction should be reversed because the evidence failed to prove that he acted as a manager, supervisor, or organizer in furtherance of the predicate offenses of the CCE or that he worked in concert with five or more others. Finally, Simms alleges that his convictions for possession of marijuana with intent to distribute should be reversed pursuant to Apprendi because the Government failed to include drug quantity or type in the indictment or the jury charge. We address each of the Appellants' challenges in turn.

II. STEWART

A.

We first address Stewart's challenge to the district court's denial of his motion to dismiss his money laundering counts for improper venue. Specifically, Stewart argues that because the overt acts constituting his money laundering convictions took place only in California and not in Virginia, the Eastern District of Virginia was the improper venue to bring charges against him. We review de novo the district court's ruling denying Stewart's motion to transfer venue. United States v. Newsom, 9 F.3d 337, 338 (4th Cir. 1993).

Article Three of the United States Constitution provides, "[T]rial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; see also U.S. Const. amend. VI ("[I]n all criminal prosecutions, the accused shall

6

enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."); Fed. R. Crim. P. 18 ("[P]rosecution shall be had in a district in which the offense was committed . . . .").

B.

Before turning to the merits of Stewart's venue argument, we first must address whether Stewart properly objected to venue before the district court. Stewart did not file a written motion objecting to venue. Instead, Livingston filed such a motion, and during Livingston's argument to the district court regarding venue, Stewart stated:

> Your Honor, just so the court will have it absolutely clear in its mind, I don't think there is any allegation[] that Roger Stewart was ever in the Eastern District of Virginia, either before the marshals brought him here pursuant to this indictment . . . . For whatever that's worth.

(JA 331.) Although the Government conceded at oral argument that this statement sufficed to inform the Government that Stewart was joining in Livingston's motion to object to venue, the Government contends that Stewart's statement does not constitute a proper objection sufficient to preserve the venue issue for appeal.

If an objection to venue is not raised in the district court, the issue is waived on appeal. United States v. Dabbs, 134 F.3d 1071, 1078 (11th Cir. 1998); United States v. Santiesteban, 825 F.2d 779, 783 (4th Cir. 1987); United States v. Winship, 724 F.2d 1116, 1124 (5th Cir. 1984). A defendant, however, does not waive his venue objection by failing to file a written pleading. United States v. Stratton, 649 F.2d 1066, 1077-79 (5th Cir. 1981).

Because proper venue is a constitutional right, waivers of venue rights through failure to object should not readily be inferred. Winship, 724 F.2d at 1124 n.7. In Winship, the Fifth Circuit held that a venue objection was preserved sufficiently because the defendants moved for a bill of particulars requesting that the Government state more particularly where the charged criminal acts occurred. See id.

7

Although the Fifth Circuit noted that the bill of particulars did not explicitly constitute a venue objection, it held that the general bill of particulars precluded a finding of waiver. See id. Similarly, in Stratton, the Fifth Circuit held that a co-defendant had properly preserved a venue objection when the district court asked him whether he adopted his co-defendants' motions to change venue and he answered "that he stood `neutral, since he knew of no grounds to object to [the change of venue] motions.'" Stratton, 649 F.2d at 1077. We agree with the Fifth Circuit that ambiguity as to the defendant's intent to waive venue should be interpreted in favor of the defendant, in light of the constitutional underpinning of the defendant's right to proper venue.

Additionally, in determining whether Stewart objected to venue in a manner sufficient to preclude a finding of waiver, we must look to the purposes of the contemporaneous objection rule."[O]ne of the fundamental purposes of the contemporaneous objection rule is to protect judicial resources, in particular by ensuring that the trial courts will have an opportunity to avoid errors that might otherwise necessitate time-consuming retrial." United States v. David, 83 F.3d 638, 644-45 (4th Cir. 1996). A second purpose of the contemporaneous objection rule is to prevent counsel from "`sandbagging' the courts by withholding a valid objection from the trial court in order to obtain a new trial when the error is recognized on appeal." Id. at 645. Here, both purposes were served sufficiently by Stewart's statement to the district court that he was in a similar position to Livingston with respect to the issue of venue. The Government concedes that it understood Stewart to be challenging venue and proceeded to argue that venue was proper with respect to both Livingston and Stewart. This provided the district court with the opportunity to rule on venue as to Stewart. Accordingly, we find Stewart's statement to the district court sufficient to have preserved the venue issue for appeal.

C.

The issue, therefore, is whether Stewart committed any overt acts of the money laundering offenses in the Eastern District of Virginia. Stewart argues that the offenses occurred entirely in California. The Government argues that by statute, Congress has made venue proper for continuing offenses in any district "in which such offense was

8

begun, continued, or completed," 18 U.S.C.A.§ 3237(a), and Stewart's offenses, while completed in California, were begun in the Eastern District of Virginia.

The Government first argues that Stewart's money laundering offenses constitute continuing offenses for purposes of establishing venue under § 3237(a) because the funds were generated from drug trafficking that took place in the Eastern District of Virginia. In United States v. Cabrales, 524 U.S. 1 (1998), the United States Supreme Court rejected the Government's argument. Id. at 7-9. In Cabrales, the money that Cabrales allegedly laundered was deposited in the AmSouth Bank of Florida and was withdrawn in Florida through four separate transactions. Id. at 4. The money deposited and withdrawn was traceable to the specified unlawful activity of illegal drug trafficking of cocaine in Missouri. Id. at 4. The Supreme Court held that Cabrales's money laundering charges did not constitute continuing offenses for purposes of § 3237(a) and that the generation of the funds through drug trafficking in Missouri was insufficient to establish venue in Missouri. Id. at 7-9.

In Cabrales, the Court delineated a possible exception to its rule that money laundering typically does not constitute a continuing offense, triable both in the district where the illegal funds were generated and the district in which the financial transaction took place. It stated that "[m]oney laundering . . . arguably might rank as a continuing offense, triable in more than one place, if the launderer acquired the funds in one district and transported them into another." Id. at 8. This exception is inapplicable to Stewart. Stewart's role in the money laundering was limited to that of a courier, who was responsible for receiving money transfers and packages in California. Stewart handled money only in California and was not responsible for or charged with the transportation of the money from Virginia to California. He testified that he simply signed for the packages and the money transfers in California and delivered them to Livingston, who was also in California, without opening the packages. Stewart also testified that he had never been to Virginia, did not know anybody in Virginia, and had never received any telephone calls from Virginia. The Government offered no evidence to contradict this testimony. Thus, the fact that the funds underlying Stewart's money laundering offenses were

9

generated through drug trafficking in the Eastern District of Virginia is insufficient to establish that venue is proper in Virginia.

Nevertheless, the Government contends that Cabrales is distinguishable because of the nature of the financial transaction at issue. In Cabrales, the financial transactions that were the subject of the money laundering offenses were Cabrales's structuring of a deposit and four withdrawals. Id. at 4. The deposit and all of the withdrawals took place in Florida. Id. The Government argues that the financial transactions underlying Stewart's money laundering offenses are distinct from the transaction involved in Cabrales because here, the transactions involve Western Union transfers that began in the Eastern District of Virginia and ended in California.

We find the Government's attempt to distinguish Cabrales unavailing. In Cabrales, the funds originally derived from a district other than the district in which the defendant handled the funds, but the Supreme Court held that fact to be of no consequence to the venue inquiry. See id. at 7. Instead, the Court emphasized that "the locus delicti [of Cabrales's charged offenses] must be determined from the nature of the crime alleged" and the location of the overt acts charged and completed by the defendant. Id. Here, as the Government notes, to complete the Western Union wire transfers, the senders deposited money with Western Union in the Eastern District of Virginia. These deposits authorized Stewart to withdraw this amount of money at a Western Union in California. Stewart neither deposited the money nor was responsible for the depositing of the money in Virginia; rather, he handled the money only in California. Moreover, Stewart was not charged with sending or transferring money through Western Union. Instead, the indictment charged Stewart only with the receipt of funds through Western Union. Therefore, the location of Stewart's charged and completed overt acts comprising his money laundering offenses consisted solely of his withdrawing funds in California, albeit funds that were derived from illegal activity in Virginia. Accordingly, under Cabrales, Stewart's money laundering offenses began, continued, and ended in California for purposes of determining proper venue, and the means by which he obtained the funds are "of no moment." Id. at 8 (internal quotation marks omitted).

Our analysis of the locus delicti of Stewart's charged offenses is further informed by the statutory definition of "financial transaction."

10

18 U.S.C.A. § 1956(c)(4). The relevant portion of the money laundering statute defines "financial transaction" as, inter alia, "a transaction . . . involving the movement of funds by wire."§ 1956(c)(4)(A)(i). With respect to a financial institution such as Western Union, see 31 U.S.C.A. § 5312(a)(2) (West 1983 & Supp. 2000), "transaction" is defined as, inter alia, a deposit or a withdrawal, see 18 U.S.C.A. § 1956(c)(3), evidencing Congress's intent to treat a deposit and a withdrawal as two separate transactions for purposes of the money laundering statute. Thus, we reject as contrary to the plain text of the money laundering statute the Government's argument that depositing and withdrawing funds through Western Union constitutes a single financial transaction rather than two or more separate financial transactions.

Absent charges of aiding and abetting or a showing that Stewart caused or participated in the overt acts of the depositors who were located in the Eastern District of Virginia, venue is improper in that district.[3] Neither do we consider the Western Union transfer, which necessitates two or more separate transactions, a single financial transaction for purposes of determining venue. Thus, we vacate Stewart's money laundering convictions.[4]

---

[3] Stewart also was charged with conspiracy to launder money. Because Stewart ultimately was acquitted of that charge, we need not address whether venue was proper with respect to the conspiracy count. We note, however, that venue in the Eastern District of Virginia arguably would have been improper on the conspiracy count with respect to Stewart unless, during the venue hearing, the Government was able to forecast some evidence demonstrating that Stewart, who had, at best, a very minor role in the alleged conspiracy, knowingly and voluntarily entered into a confederacy involving the Eastern District of Virginia. See United States v. Cabrales, 524 U.S. 1, 9 (1998) (noting that venue would be proper for Cabrales on the conspiracy charge only if the government could prove that Cabrales entered into the agreement as alleged); United States v. Bowens, 224 F.3d 302, 311 n.4 (4th Cir. 2000) ("[I]n a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires.").

[4] Insofar as we vacate Stewart's money laundering convictions for improper venue, we need not reach Stewart's other challenges to his money laundering convictions.

11

III. <u>LIVINGSTON</u>

A.

Livingston first contends that the district court erred by denying his motion for mistrial. We review the district court's denial of a motion for mistrial for abuse of discretion. <u>United States v. Dorlouis</u>, 107 F.3d 248, 257 (4th Cir. 1997).

Livingston's mistrial motion arose out of a gesture he made toward the jury, whereby Livingston pointed his fingers in the shape of a gun, imitated squeezing the trigger, and said "pop" in the direction of the jury during a bench conference. Livingston contends that his threatening gesture was provoked by prosecutorial misconduct. The prosecutor admitted that he improperly communicated with Livingston after Livingston walked by him on several occasions and stated, "Not guilty, not guilty, not guilty." (J.A. at 511.) In response, the prosecutor said, "Life." Livingston characterizes the prosecutor's comment as an illegal attempt to provoke Livingston, which resulted in Livingston's gesture to the jury.

Initially, we note that the causal relationship between the prosecutor's comment and Livingston's gesture is tenuous at best. Additionally, we reject Livingston's characterization of the prosecutor's comment as an attempt to provoke Livingston. To the contrary, the district court made a factual finding on the record that the prosecutor's comment was not intended to provoke Livingston; rather, Livingston provoked the prosecutor's comment. Insofar as Livingston has failed to demonstrate that this factual finding is clearly erroneous, we are bound by it. <u>See United States v. Smith</u>, 44 F.3d 1259, 1269 (4th Cir. 1995) (noting that district court's factual findings with respect to a motion for mistrial are subject to the clearly erroneous standard of review); <u>cf. United States v. Meredith</u>, 824 F.2d 1418, 1429 (4th Cir. 1987) (holding that when the prosecutor's improper comment is invited by the defendant, the comment does not constitute reversible error).**5**

_____

**5** We note that Livingston does not argue that the prosecutor's improper comment provides an independent basis for a mistrial, nor could he suc-

12

Having concluded that Livingston's gesture was not caused by prosecutorial misconduct, we next address whether Livingston is entitled to a mistrial because the threatening gesture nevertheless tainted the jurors' ability to render a fair and impartial verdict, violating his Sixth Amendment right. See United States v. Thompson , 744 F.2d 1065, 1068 (4th Cir. 1984). As the district court noted, granting Livingston's mistrial motion on the basis of Livingston's own misconduct would subvert the judicial process and allow Livingston to benefit from his own wrongdoing. If such behavior on the part of the defendant were held to require a mistrial, "it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so." United States v. West, 877 F.2d 281, 289 (4th Cir. 1989) (internal quotation marks omitted); see also United States v. Harris, 2 F.3d 1452, 1456 (7th Cir. 1993) (holding that the defendant was not entitled to a mistrial as the result of his own outburst during trial because to grant the mistrial would allow the defendant to profit from his own wrong); cf. United States v. Dockins, 986 F.2d 888, 893 (5th Cir. 1993) (holding that a defendant was not entitled to a mistrial when the motion was based upon his own misconduct and the district court concluded that the defendant had been trying to provoke a mistrial). Accordingly, we hold that the district court acted within its discretion by denying Livingston's motion for a mistrial based upon Livingston's own misconduct.

B.

Livingston next challenges the district court's denial of his motion to transfer venue with respect to his twelve substantive money laundering offenses and his single substantive drug offense. We review de novo the district court's ruling denying Livingston's motion to transfer venue. United States v. Newsom, 9 F.3d 337, 338 (4th Cir. 1993). When multiple counts are alleged in an indictment, venue must be

_____

cessfully advance such an argument, in that Livingston concedes that the jury was never made aware of the prosecutor's comment. See United States v. Curry, 993 F.2d 43, 45 (4th Cir. 1993) (noting that for prosecutorial misconduct to warrant a mistrial, the misconduct must have "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial").

13

proper on each count. See United States v. Bowens, 224 F.3d 302, 308 (4th Cir. 2000).

1.

Livingston contends that because he was never physically present in the Eastern District of Virginia, venue is improper in that district. As we noted in Bowens, however, the appropriate focus for determining venue is "the place of the crime," and"[t]he inquiry into the place of the crime may yield more than one appropriate venue, or even a venue in which the defendant has never set foot." Id. at 309. In determining the place of the crime, we look to the location of the essential conduct elements of the offense. Id.

Livingston was charged and convicted of money laundering under 18 U.S.C.A. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i). The financial transactions underlying Livingston's money laundering offenses are essential conduct elements of the offenses. See United States v. Cabrales, 524 U.S. 1, 7 (1998). Those transactions were outlined in the indictment as the "sending and receiving monies through Western Union Financial Services, Inc., and causing the movement of funds by wire, from the Eastern District of Virginia to various locations including Jamaica and the greater New York, NY and Los Angeles, CA areas." (J.A. at 207, 213.) The evidence introduced at trial demonstrated that Livingston structured and directed a number of these financial transactions. For example, Trevor Smith, Cassandra Crumble, Frederick Dixon, and Marlon Johnson all testified that they sent money from the Eastern District of Virginia to Los Angeles at the behest and direction of Livingston. They testified that Livingston provided them with aliases to use when wiring money from the Eastern District of Virginia. Livingston also told the senders to whom they were to send the money transfers and packages and provided them with addresses. The evidence also demonstrated that Livingston was responsible for generating the drug proceeds in the Eastern District of Virginia by sending packages of marijuana to distributors in that district for resale. Additionally, while in the Eastern District of Virginia, Dixon testified that he spoke directly with Livingston on the telephone to receive instructions from Livingston regarding the distribution of the marijuana in the Eastern District of Virginia and the wire transfers from that district to California. Thus, it is clear that Livingston was respon-

14

sible for the acquisition of the drug proceeds in the Eastern District of Virginia and the interstate transportation of the proceeds involved in the financial transactions from the Eastern District of Virginia to Los Angeles, California.

As noted previously, in Cabrales, the Supreme Court delineated an exception to its general rule that money laundering does not constitute a continuing offense, stating that "[m]oney laundering . . . arguably might rank as a continuing offense, triable in more than one jurisdiction if the launderer acquired the funds in one district and transported them into another." Cabrales, 524 U.S. at 8. Where, as here, Livingston is responsible for the acquisition of the funds in the Eastern District of Virginia and the subsequent interstate transportation of the funds from the Eastern District of Virginia to Los Angeles, we have no difficulty concluding that Livingston's conduct falls within this exception. See id. at 7 (noting as significant that the counts at issue did not link Calabres to, "or assert her responsibility for, acts done by others" (emphasis added)); see also United States v. Kim, 246 F.3d 186, 192 (2d Cir. 2001) (holding that venue was proper for a substantive wire fraud conviction as a continuing offense when the defendant, although not the actual sender or receiver of wire transmissions, "caused communications to be transmitted into and out of the district" in which the defendant was tried). Thus, Livingston's money laundering offenses constitute continuing offenses that properly can be tried either in the district where the offense began, continued, or was completed. See 18 U.S.C.A. § 3237(a). Livingston's shipments of marijuana into the Eastern District of Virginia, along with his telephone calls into that district instructing the distribution of the marijuana in Virginia and the transportation of the funds back to California, and his structuring of the financial transactions of sending and receiving the drug proceeds from the Eastern District of Virginia to California, demonstrate unequivocally that Livingston's money laundering offenses began and continued in the Eastern District of Virginia. See United States v. Gilboe, 684 F.2d 235, 237, 239 (2d Cir. 1982) (holding that venue was proper in New York for the continuing offense of wire fraud when the defendant, who lived in Hong Kong, made several telephone calls to New York to arrange the fraudulent conduct); United States v. Lewis, 676 F.2d 508, 511 (11th Cir. 1982) (finding that telephone call from Florida to Texas was sufficient to establish

15

venue in the Western District of Texas when the telephone call was in furtherance of the offense). Thus, venue is proper in that district.

2.

Livingston next argues that his conviction for possession with intent to distribute marijuana should be dismissed because venue is improper in the Eastern District of Virginia. The essential conduct element of a § 841(a)(1) offense is possession, see 21 U.S.C.A. § 841(a)(1); therefore, Livingston can properly be tried in any district where he had possession of the marijuana, whether he intended to distribute the marijuana in that district or somewhere else. Livingston contends that the overt acts underlying his substantive drug offense occurred only in California, making venue improper in the Eastern District of Virginia. We disagree.

Livingston's substantive drug offense, which is charged in Count 290, charges Livingston and others not only with possession with intent to distribute marijuana in violation of 21 U.S.C.A. § 841(a)(1), but also with aiding and abetting in violation of 18 U.S.C.A. § 2. Further, the district court instructed the jury on aiding and abetting with respect to Count 290. As we noted in Bowens,"a defendant who is charged as an aider or abettor is subject to venue in any place where the principal could be tried." Bowens, 224 F.3d at 311 n.4; cf. Cabrales, 524 U.S. at 7 (finding venue improper in part because the government had not charged the defendant as an aider and abettor). Because others involved in the drug trafficking testified that they completed essential conduct elements of the substantive offense of possession with intent to distribute in the Eastern District of Virginia, Livingston properly could be tried in that district as an aider or abettor.[6]

_____

[6] Livingston also argues that the evidence was insufficient on his substantive count of possession with intent to distribute because of the Government's failure to prove possession in the Eastern District of Virginia. This argument also fails on the reasoning above because Livingston was properly charged and convicted as an aider and abettor to the principals' overt acts of possession in Virginia.

16

C.

Livingston next contends that the district court violated his Sixth Amendment right to effective assistance of counsel by denying Livingston's motion for a continuance because the denial forced his counsel to proceed to trial without an adequate amount of preparation time. To prove abridgment of his Sixth Amendment right to effective assistance of counsel based upon the district court's allegedly wrongful denial of continuance, Livingston must prove first that the district court abused its discretion in denying the continuance motion and second that the denial "specifically prejudiced" his case. United States v. LaRouche, 896 F.2d 815, 823 (4th Cir. 1990) (internal quotation marks omitted).

Livingston maintains that the district court abused its discretion by allowing his counsel only 46 days preparation, approximately 6 weeks, from the date of arraignment to that of trial. He points to the amount of preparation time given his co-defendants, 152 days, as proof that 47 days was inadequate. The Supreme Court has defined "abuse of discretion" in the context of a denial of a motion for continuance as "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted). The Supreme Court has noted that "broad discretion must be granted" to district courts because "[t]rial judges necessarily require a great deal of latitude in scheduling trials." Id. at 11.

Under this deferential standard, we do not believe the district court abused its discretion by concluding that more than 6 weeks was an adequate amount of time for Livingston's counsel to prepare for trial. See LaRouche, 896 F.2d at 823-24 (holding that district court did not abuse its discretion by denying continuance motion when counsel had 34 days to prepare from arraignment to trial). Simms and Stewart were arraigned on May 21, 1997, and trial originally was set for September 11, 1997.[7] In September, the Government moved for a continuance for the purpose of arraigning Livingston, who had been arrested

---

[7] The parties agreed that the case was complex, warranting the district court to set the trial date beyond the 70 days allowed under the Speedy Trial Act, 18 U.S.C.A. § 3161 (West 2000).

17

in August.**8** The district court agreed that the interests of justice were served by trying Livingston with the other defendants; thus, it granted the Government's unopposed motion for continuance. During the hearing on the Government's continuance motion, Livingston's co-defendants requested that the trial be set for October 6. Livingston's counsel indicated that a trial date of October 6 would not give him adequate time to prepare for trial. To reasonably accommodate Livingston's request for adequate preparation time, the district court set the trial date for October 20 rather than October 6. It noted, however, that it would not entertain further motions for continuance, in light of the interest of the public and the defendants in the trial commencing within a reasonable amount of time after arraignment. Livingston then waited until October 10, over a month later, to file a written motion for a continuance, relying upon the complexity of the case and his difficulty in making photocopies of the relevant documents related to his case.**9** Considering Livingston's delay in bringing the motion and the district court's expressed interest in accommodating the public's, Livingston's, and his co-defendants' interests in a reasonably speedy trial, we cannot conclude that the district court acted arbitrarily or without reason in denying Livingston's motion for continuance. LaRouche, 896 F.2d at 824 ("The later that a motion for a continuance is made, the more likely it is made for dilatory tactics; hence, it is less likely that the district court arbitrarily denied the continuance."). Accordingly, although we agree that this was a complex trial, we conclude that the district court did not abuse its discretion by denying Livingston's motion.

Further, even assuming that the denial of Livingston's motion was an abuse of discretion, Livingston is unable to demonstrate that his convictions warrant reversal due to "specific prejudice" stemming from the district court's denial of his motion. Id. at 825. "[I]n the absence of circumstances giving rise to a presumption that the defen-

_____

**8** Livingston had not been arraigned and arrested earlier with his co-defendants because the Government had not known his real name.
**9** In support of his motion for continuance, Livingston did not contend that he had difficulty obtaining discovery documents from the Government. Rather, Livingston stated that he was unable to finish making photocopies of the pertinent documents because the photocopy machine he was using "broke down." (J.A. at 305.)

18

dant's case was prejudiced, the defendant must point to specific errors made by defense counsel that undermine confidence in the outcome of the trial." Id. at 823. In United States v. Cronic, 466 U.S. 648 (1984), the Supreme Court held that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." Id. at 662. Surrounding circumstances that justify a presumption of ineffectiveness include either actual or constructive absence of counsel during a critical stage of the trial. Id. at 660.

Allowing approximately 6 weeks of preparation time for counsel does not result in a constructive absence of counsel giving rise to a presumption of ineffectiveness. See Cronic, 466 U.S. at 666 (holding that counsel, who was inexperienced, was not presumed ineffective when given only 25 days to prepare for trial in a bank fraud case); Avery v. Alabama, 308 U.S. 444 (1940) (holding that counsel was not presumed ineffective when given only 3 days to prepare for a capital case because witnesses and evidence easily were accessible). This conclusion is bolstered by counsel's ability to prepare several pre-trial motions, including the motion to transfer venue and a motion to quash the indictment. These motions demonstrate that Livingston's counsel was very familiar with the nature of the charges against Livingston and the Government's evidence. Thus, we conclude that the circumstances surrounding Livingston's case were not such that prejudice must be presumed.

Moreover, Livingston fails to "point to specific errors made by defense counsel that undermine confidence in the outcome of the trial." LaRouche, 896 F.2d at 823. Neither do we believe that Livingston could demonstrate errors sufficient to undermine confidence in the outcome of the trial, in that the evidence against Livingston was overwhelming, with several of his co-conspirators testifying as to the extent of his involvement in the drug trafficking and money laundering schemes. As a result, we conclude that Livingston has not established that he was prejudiced by the denial of his motion for continuance. Thus, the district court's denial of Livingston's continuance motion does not constitute reversible error.

D.

Livingston was convicted of two sets of money laundering charges. The first set charged him with six counts of laundering proceeds of

19

an unlawful activity with the intent to promote the carrying on of said unlawful activity in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (Counts 82, 83, 88-91), and the second set charged Livingston with six counts of laundering proceeds of an unlawful activity with knowing concealment of those proceeds in violation of § 1956(a)(1)(B)(i) (Counts 115-120). The Government concedes that Counts 82, 83, and 88-91 are based upon the same financial transactions as Counts 115-120, and the same evidence was used to prove each. Livingston argues that his convictions for separate money laundering charges based upon the same financial transactions are, under these circumstances, multiplicitous. See United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993) ("Multiplicity . . . is the charging of a single offense in several counts." (internal quotation marks omitted)). Because he raised this argument below, we review the multiplicity of the money laundering charges de novo. See United States v. Hall, 972 F.2d 67, 69 (4th Cir. 1992) (noting that interpretation of a statute is a purely legal question calling for de novo review).

In Sanabria v. United States, 437 U.S. 54 (1978), the Supreme Court noted that the fact that a defendant uses differing means to commit a single offense does not convert that single offense into separate offenses. See id. at 65 n.20 (citing Fed. R. Crim. P. 7(c)(1), which provides that "[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."). In Sanabria, the Government had charged the defendant with violating 18 U.S.C.A. § 1955, which makes it a federal offense to "conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business." Sanabria, 437 U.S. at 56 (internal quotation marks omitted). Pursuant to § 1955, a defendant can violate the statute in several different ways. 18 U.S.C.A. § 1955(b)(2). The indictment charged two separate counts alleging violations of § 1995; one count alleged a violation of that section by "horse betting," and one alleged a violation of that section by "numbers betting." Id. at 61. The Supreme Court noted that the Government erred by charging Sanabria with two separate violations of § 1955. It stated that because the indictment alleged only a single gambling business, only a single offense had been charged, and the use of separate means by which the

20

offense was commited did not create separate offenses. Id. at 65-66 nn.19 & 20.**10**

Likewise, in United States v. Kimbrough, 69 F.3d 723 (5th Cir. 1995), the Fifth Circuit concluded that two counts of possession of child pornography were multiplicitous. See id. at 729. In Kimbrough, the government charged the defendant with two counts of possession of child pornography, in violation of 18 U.S.C.A.§ 2252(a)(4)(B) (West 2000), based upon the same conduct and evidence. See id. The only difference between the counts was whether the pornographic pictures or the materials used to produce the pictures traveled in commerce. See id. Because these were two different means to accomplish the same offense, the Fifth Circuit held that the two separate counts amounted to "an unlawful attempt to divide a single offense into multiple offenses." Id.

Similar to the statutes at issue in Sanabria and Kimbrough, the text of § 1956 establishes that an illegal financial transaction creates a single offense of money laundering, and the statute sets forth various means by which the offense of money laundering is committed. United States v. Brown, 186 F.3d 661, 670 (5th Cir. 1999) (noting that the promotion and concealment prongs are two different types of mens rea that can be used to constitute the offense conduct); United States v. Navarro, 145 F.3d 580, 585 (3d Cir. 1998) (explaining that § 1956 describes a single offense of money laundering and provides for differing mental states that suffice for purposes of being convicted under that section); United States v. Marbella, 73 F.3d 1508, 1514 (9th Cir. 1996) (noting that promotion and concealment are two different mens rea elements listed in the disjunctive). Section 1956

_____

**10** In Sanabria v. United States, 437 U.S. 54 (1978), the Supreme Court also held that the "same evidence" test, developed in Blockburger v. United States, 284 U.S. 299 (1932), applies only when the government charges distinct offenses arising under "separate statutes." Id. at 70 n.24; see also United States v. Kimbrough, 69 F.3d 723, 729-30 n.5 (5th Cir. 1995) (noting that Blockburger does not apply when the two alleged offenses are based upon a single statute); United States v. Johnson, 130 F.3d 1420, 1426 n.2 (10th Cir. 1997) (same). Here, as in Sanabria and Kimbrough, the Government is alleging distinct offenses based upon a single statute.

21

describes the separate mental states that will suffice to prove the offense conduct in the disjunctive. See §§ 1956(a)(1)(A)(i) & (B)(i) ("[W]ith the intent to promote the carrying on of specified unlawful activity; . . . or (B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . ." (emphasis added)). Because the promotion and concealment prongs are simply two different means by which the requisite mens rea for the single offense of money laundering may be proven, we conclude that the fact that Livingston possessed two different types of mens rea while completing each financial transaction at issue cannot create distinct offenses. Cf. United States v. Zvi, 168 F.3d 49, 56-57 (2d Cir. 1999) (holding that charging defendant for same financial transaction under §§ 1956(a)(1)(B)(i) and (a)(2)(B)(i) was multiplicitous); United States v. Holmes, 44 F.3d 1150, 1154-56 (2d Cir. 1995) (overturning structuring conviction as multiplicitous with money laundering conviction where both convictions were based upon the same financial transaction, despite two separate improper purposes).[11] Accordingly, it was improper for the district court to allow Livingston to be convicted on two separate sets of money laundering charges based upon the same financial transactions simply because Livingston possessed two different mental states. [12] Insofar as Livingston's sentence is unaffected by the reversal of Counts 115-120,[13] we

_____

[11] The Senate Report further bolsters our conclusion that separate mental states do not, without more, create separate offenses under the money laundering statute, in that it describes § 1956(a)(1) as the "basic money laundering offense," and indicates that, to prove a violation of this single offense, the Government must show that the defendant "either intended to facilitate a crime or knew that the transaction was designed to conceal the proceeds of a crime." S. Rep. No. 99-433, at 8 (1986).

[12] As the Government notes, we have affirmed multiple money laundering convictions under the concealment and promotion prongs based upon the same financial transaction. United States v. Winfield, 997 F.2d 1076, 1079 (4th Cir. 1993). In Winfield, however, the issue of multiplicity was not raised for our review. See id. at 1079 & n.3. Thus, Winfield does not control our resolution of this issue.

[13] Livingston was sentenced to 360 months on his drug conspiracy conviction, 240 months on his conviction for conspiracy to launder money, 240 months on his substantive money laundering convictions, and 240 months on his substantive drug possession with intent to distribute conviction, all of which were imposed concurrently.

22

affirm Livingston's sentence but remand for the district court to vacate Livingston's convictions under Counts 115-120 and the sentences and assessments associated with these convictions.**14** See Ball v. United States, 470 U.S. 856, 864-65 (1985) (holding that the sole remedy for multiplicity is to vacate the multiplicitous convictions and sentences); Burns, 990 F.2d at 1438-39 (holding that all but one of the multiplicitous charges must be vacated).

E.

Livingston challenges the sufficiency of the evidence with respect to the money laundering convictions under Counts 82, 83, and 88-91. These counts charged Livingston with six counts of laundering proceeds of an unlawful activity with the intent to promote the carrying on of said unlawful activity in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i). Livingston argues that no evidence was introduced establishing that his drug proceeds were used to promote his drug trafficking operation. In evaluating the sufficiency of the evidence, the jury verdict must be upheld if there exists substantial evidence, including circumstantial and direct evidence, to support the verdict, viewing the evidence in the light most favorable to the government. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Burgos, 94 F.3d 849, 862 & n.5 (4th Cir. 1996) (en banc).

Although Section 1956(a)(1)(A)(i) requires proof that illegal proceeds were spent in furtherance of the specified unlawful activity, which in this case is drug trafficking, it does not require that the government "trace the money [spent in furtherance of the illegal drug trafficking] to a particular illegal drug transaction." United States v. Hardwell, 80 F.3d 1471, 1483 (10th Cir. 1996), rev'd in part on other grounds after rehearing by United States v. Hardwell, 88 F.3d 897

_____

**14** Because we conclude that the district court must vacate these money laundering convictions and sentences on remand, we need not address Livingston's argument that Counts 115-120 failed to charge adequately concealment of proceeds; nor need we address Livingston's sufficiency of the evidence challenge with respect to these counts. See United States v. Zvi, 168 F.3d 49, 57-58 (2d Cir. 1999) (determining that counts were multiplicitous and vacating the count that was subject to challenge on other grounds).

23

(10th Cir. 1996). "Evidence that a defendant was engaged in drug trafficking and had insufficient legitimate income to produce the money used in a transactions is sufficient to establish that the money was derived from proceeds of drug distribution." Id.; see also United States v. Puig-Infante, 19 F.3d 929, 940 (5th Cir. 1994) (stating that "[al]though proof of [a defendant's] limited income, by itself, is insufficient to support a conviction under section 1956, evidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when the defendant claims income from additional sources" and that "the jury is entitled to consider such proof in combination with additional evidence, such as evidence of [a] defendant's drug trafficking" (internal quotation marks and citations omitted) (alterations in original)). Here, viewing the evidence in the light most favorable to the Government, there is sufficient evidence to support the inference that Livingston reinvested illegal proceeds into the drug trafficking operation.

The evidence that Livingston received funds from the drug trafficking was overwhelming. Several of Livingston's co-conspirators testified that Livingston recruited them to ship marijuana and retrieve wire transfers for him. Co-conspirators who operated in the Eastern District of Virginia testified about paying Livingston by Western Union wire transfers or overnight express shipments of cash. One co-conspirator identified wire tapped conversations between him and Livingston during which the co-conspirator told Livingston the tracking numbers of wire transfers he was sending to Livingston in payment for marijuana.

There also was a considerable amount of evidence regarding a wide array of purchases by Livingston that furthered the drug trafficking operation. Livingston often purchased large quantities of marijuana from Mexican suppliers in the presence of co-conspirators. Livingston rented an apartment for the purpose of packaging marijuana. Jean Filsaime, a co-conspirator, testified that he paid Stewart for his courier services, on behalf of Livingston, with drug proceeds. Filsaime also testified that Livingston purchased a blue Acura, which later was used to transport marijuana and to retrieve wire transfers. The car cost approximately $10,000, and Livingston paid for it with cash.

No evidence was introduced establishing that Livingston had legitimate employment that would support such expenditures. When asked

24

what Livingston did for a living, Filsaime testified that Livingston dealt marijuana. When asked how Livingston made his money, Courtney Minors, another co-conspirator, testified that Livingston made his money by selling marijuana.

Based upon evidence establishing both that Livingston received large amounts of money from drug trafficking, spent large amounts of money in furtherance of drug trafficking, and possessed insufficient legitimate income to support these expenditures, the jury was entitled to infer that a portion of the drug proceeds were reinvested into the drug operation. Thus, the evidence is sufficient to support Livingston's money laundering convictions under § 1956(a)(1)(A)(i).

F.

Livingston next challenges the sufficiency of evidence with respect to his conviction for conspiracy to distribute marijuana. In reviewing a conspiracy conviction, we "view[] the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government," and determine "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." Burgos, 94 F.3d at 863 (internal quotation marks omitted).

To prove a drug conspiracy, the Government must prove the following: "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." United States v. Heckard, 238 F.3d 1222, 1229 (10th Cir. 2001); see 21 U.S.C.A. § 846. Livingston argues that the Government failed to establish the element of interdependence.

Interdependence is established when the activities of alleged co-conspirators in one aspect of the charged scheme are necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole. See Heckard, 238 F.3d at 1231; see also United States v. Barsanti, 943 F.2d 428, 439 (4th Cir. 1991) ("A single conspiracy exists where there is one overall agreement, . . . or one general busi-

25

ness venture. Whether there is a single conspiracy depends upon the overlap of the main actors, methods and goals.").

Here, the evidence overwhelmingly proves the interdependence between Livingston and the Virginia drug distributors. The evidence demonstrates that Livingston was the main supplier of marijuana to a drug distribution ring in Virginia. Livingston recruited a group of people in California to aid with the packaging of the marijuana for shipment to Virginia, the shipment of the marijuana to Virginia, and the receipt of the drug proceeds from Virginia. One of the Virginia distributors testified that Livingston shipped them over seven hundred pounds of marijuana during the course of the conspiracy and that, during the summer of 1996, they were getting two to three boxes of marijuana a day, which was coming primarily from Livingston. Many of the distributors in Virginia knew Livingston and dealt with him directly to obtain marijuana or to send him payments for marijuana. Cassandra Crumble testified that at one point, when the distribution in Virginia was struggling because the marijuana supply was being interrupted by police seizures, she notified Livingston to help solve the problem, and Livingston increased his supply so that the distribution could become more profitable.

Viewing this evidence in the light most favorable to the Government, the evidence demonstrates the existence of common goals, mutual cooperation, and a long-standing business relationship between Livingston and the Virginia distributors. United States v. MacDougall, 790 F.2d 1135, 1146 (4th Cir. 1986) (noting that a pattern of mutual cooperation between participating individuals demonstrates the requisite level of interdependence to support a conspiracy). The Virginia distribution ring could not have been successful without Livingston's continuous supply of marijuana, nor could Livingston have been successful without the distribution ring in Virginia. United States v. Portela, 167 F.3d 687, 697 (1st Cir.1999) (noting that the requisite level of interdependence had been established when "there was sufficient evidence for the jury to conclude that [the appellant] understood that his transaction's success depended on the health of the trafficking"). Based upon the overlap of the actors, the continuous nature of Livingston's venture with the Virginia distributors, the amount of marijuana supplied from Livingston to the Virginia distributors, the mutual cooperation between participating individuals, and

26

the common goals between participating individuals, we conclude that a reasonable jury could infer interdependence. United States v. Horn, 946 F.2d 738, 741 (10th Cir. 1991) ("[I]f the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole, evidence of interdependence is present."). Accordingly, the evidence was sufficient to support Livingston's conspiracy conviction.

G.

Livingston next challenges his conviction and sentence under Apprendi v. New Jersey, 530 U.S. 466 (2000), with respect to his conviction under Count 1 for conspiracy to possess with intent to distribute marijuana.[15] During the pendency of this appeal, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. Livingston argues that his 360-month sentence is invalid in light of Apprendi because, he maintains, it exceeds the maximum statutory penalty authorized by the jury verdict. Because Livingston failed to raise this argument before the district court, our review is for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993).

To establish our authority to notice an error not preserved by a timely objection, Livingston must show: (1) that an error occurred; (2) that the error was plain; (3) that the error affected his substantial rights; and (4) that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. Id. at 732. Livingston concedes that Count 1 properly charged drug quantity and type and challenges only the jury instruction, wherein the district court informed the jury that "[i]t is not necessary for the government to

_____

[15] At oral argument, when Livingston's counsel was asked what count he was challenging on Apprendi grounds, he stated that he was challenging only the conviction and sentence under Count 1 and did not raise Apprendi with respect to his conviction and sentence under Count 290 for his substantive charge of possession with intent to distribute. Therefore, to the extent an Apprendi argument was available as to Count 290, we consider it waived.

27

prove the exact or precise amount of controlled substances alleged in the indictment." (T.T. at 78). Because the indictment properly charged drug quantity and type, the only error is with respect to the jury instruction. We have recently held that drug quantity and type are elements of § 841. <u>United States v. Promise</u>, No. 99-4737, ___ F.3d ___ (4th Cir. June 29, 2001) (en banc); <u>United States v. Angle</u>, No. 96-4662, ___ F.3d ___ (4th Cir. June 29, 2001) (en banc). However, the failure to instruct the jury on an element of an offense does not constitute error per se. <u>Neder v. United States</u>, 527 U.S. 1, 15 (1999) (holding that failure to instruct the jury on an essential element of the offense is not structural error).

For purposes of this appeal we conclude that the district court's jury instruction with respect to drug quantity was erroneous. We further conclude that the error is plain. Nevertheless, we affirm Livingston's sentence because Livingston has not shown that the error affected his substantial rights.

To establish that the error affected his substantial rights, Livingston must demonstrate that it was prejudicial -- that it "actually affected the outcome of the proceedings." <u>United States v. Hastings</u>, 134 F.3d 235, 240 (4th Cir. 1998). Thus, Livingston must demonstrate that the 360-month sentence imposed by the district court was longer than that which would otherwise have been authorized by the jury verdict.

In light of Livingston's prior felony drug conviction,**16** Livingston was subject to a 360-month sentence upon proof of Livingston's involvement with over 50 kilograms of marijuana. <u>See</u> 21 U.S.C.A. § 841(b)(1)(C). The jury heard testimony from one of Livingston's co-conspirators that Livingston shipped them over 700 pounds of marijuana, which equals over 300 kilograms, during the course of the conspiracy. Another co-conspirator, Dixon, identified a wiretapped conversation with Livingston wherein Livingston admitted to supplying Dixon with 7 pounds of marijuana, which equals 3.8 kilograms. In another wiretapped conversation, Dixon and Livingston discussed Livingston's shipment of 13 pounds of marijuana to Dixon, which

_____

**16** At sentencing, the district court found that the Government had properly charged Livingston as having a prior felony conviction for possession of a controlled substance.

28

converts to 5.91 kilograms. Marlon Johnson testified that on one occasion, Livingston shipped him two packages of marijuana, which together weighed approximately 40 pounds, or 18.18 kilograms. Johnson also testified that he overheard a conversation implicating Livingston in the sale of 17 pounds of marijuana, or 7.73 kilograms, to another co-conspirator. Co-conspirators further testified that they witnessed Livingston buying "large plastic garbage bags" filled with marijuana. (J.A. at 910.) The jury also heard evidence that Livingston was arrested mailing two packages of marijuana, which were weighed to contain 50 pounds of marijuana, or 22.73 kilograms.

Based upon the uncontested and overwhelming evidence implicating Livingston with several times more than 50 kilograms of marijuana, Livingston is unable to demonstrate that the 360-month sentence he received exceeds the statutory penalty that would have been authorized by the jury verdict absent the erroneous jury instruction.[17] Because Livingston cannot demonstrate that he was prejudiced by the error in the jury instruction, we decline to notice the Apprendi error with respect to Livingston's conviction and sentence for conspiracy to possess with intent to distribute marijuana.[18]

_____

[17] Although Livingston "contested" that the Government overestimated the drug quantity for sentencing purposes, he certainly did not "genuinely contest[]" that the quantity of marijuana at issue was more than the threshold of 50 kilograms necessary to support his sentence under § 841(b)(1)(c). See United States v. Strickland, 245 F.3d 368, 381 (4th Cir. 2001). As such, the error did not affect his substantial rights.

[18] There also was sufficient evidence of drug weights to support the base offense level of 32 applied by the district court. Factual determinations that increase a defendant's sentence under the sentencing guidelines do not implicate Apprendi and may be made by the sentencing judge. United States v. Kinter, 235 F.3d 192, 201 (4th Cir. 2000). We will not reverse the district court's factual determinations absent clear error. United States v. Love, 134 F.3d 595, 606 (4th Cir. 1998). The amount of drugs attributable to Livingston during the sentencing hearing were supported by, inter alia, testimony from co-conspirators, seized packages, and information obtained through wiretaps. The district court also accounted for a statistical margin of error in the drug weights by adjusting the amount downward so as not to trigger the highest base offense level. The district court has broad discretion in determining what infor-

29

H.

Finally, Livingston contends that the district court erred by applying a two level enhancement for obstruction of justice. To apply the obstruction-of-justice enhancement, the district court must find that a defendant "consciously act[ed] with the purpose of obstructing justice." United States v. Romulus, 949 F.2d 713, 717 (4th Cir. 1991) (internal quotation marks omitted). We review the district court's factual findings that serve as a basis for an obstruction-of-justice enhancement for clear error. United States v. Gormley, 201 F.3d 290, 294 (4th Cir. 2000).

United States Sentencing Guideline § 3C1.1 (1998) provides in part, "If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing during the instant offense . . . increase the offense level by 2 levels." U.S.S.G. § 3C1.1. "[T]hreatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" are types of conduct to which the § 3C1.1 obstruction enhancement applies. U.S.S.G. § 3C1.1 cmt. n.4(a). The district court found that the obstruction enhancement was warranted because Livingston's continuous misconduct throughout the trial indicated that he had been attempting to intimidate the jurors. In particular, the district court pointed to an incident in which Livingston made a gun-like gesture in the presence of the jurors and an incident in which Livingston shouted, "Not guilty," outside the jury room. (J.A. at 1687.) To the extent that Livingston argues that these instances of improper conduct were provoked by improper conduct on the part of the prosecutor and were not intended as intimidation, the district court made a factual finding on the record to the contrary, and Livingston

_____

mation to credit in making its calculations, United States v. Falesbork, 5 F.3d 715, 722 (4th Cir. 1993), and the district court need not use actual amounts and may estimate the quantity of controlled substances implicated in a conspiracy charge, United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir. 1994). Accordingly, we conclude that the district court did not clearly err in its calculation of the drug quantities attributable to Livingston.

30

has failed to demonstrate that this factual finding was clearly erroneous. Thus, we affirm the two-level enhancement for obstruction of justice.

IV. SIMMS

A.

Simms raises three challenges with respect to his CCE conviction. To establish a conviction for engaging in a CCE, the Government must prove the following five elements: (1) the defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) the defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) the defendant derived substantial income or resources from the continuing series of violations. 21 U.S.C.A. § 848(c).

1.

Simms first challenges the district court's jury instruction with respect to his CCE conviction. Specifically, Simms contends that the district court erred by failing to instruct the jury that it must unanimously agree as to which three violations of Title 21 constituted the series of transactions that comprised the CCE. After Simms was convicted and sentenced, the Supreme Court held that, in a prosecution for engaging in a CCE under 21 U.S.C.A. § 848, the jury "must agree unanimously about which three crimes the defendant committed." Richardson v. United States, 526 U.S. 813, 818 (1999). Because Simms failed to object to the CCE jury instruction before the district court, we review for plain error. See United States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000).

To establish plain error, Simms must demonstrate: (1) that error occurred; (2) that the error was plain; (3) that the error affected his substantial rights; and (4) that the error "seriously affected the fairness, integrity or public reputation" of the judicial proceeding. United States v. Olano, 507 U.S. 725, 732 (1993) (internal quotation marks

31

omitted). Here, the district court failed to instruct the jury on this una-
nimity requirement because at the time, Fourth Circuit precedent did
not require such an instruction. See United States v. Hall, 93 F.3d
126, 129-30 (4th Cir. 1996) (holding that the jury was not required
to unanimously agree that three or more drug violations were related
to each other), overruled by Richardson v. United States, 526 U.S.
813 (1999). Thus, the jury instruction was erroneous, establishing the
first prong of the plain error test. Likewise, the error was plain. As
the Supreme Court noted in Johnson v. United States, 520 U.S. 461
(1997), "where the law at the time of trial was settled and clearly con-
trary to the law at the time of appeal -- it is enough that an error be
`plain' at the time of appellate consideration." Id. at 468.

Although the first two prongs of the plain error test have been
established, Simms cannot demonstrate that the error affected his sub-
stantial rights.[19] The requirement that the error affect substantial rights
"typically means that the defendant is prejudiced by the error in that
it affected the outcome of the proceedings." United States v. Rolle,
204 F.3d 133, 138 (4th Cir. 2000). To establish the type of prejudice
required by the third prong of the plain error test, Simms must "dem-
onstrate that the erroneous . . . instruction given by the district court
resulted in his conviction." United States v. Hastings, 134 F.3d 235,
243-44 (4th Cir. 1998). Under plain error review, the burden is upon
the defendant to prove that the error was not harmless. Id. at 240.

In this case, Simms was charged and unanimously found guilty of
four counts of illegal use of a communication device, in violation of
21 U.S.C.A. § 843(b), and six counts of possession with intent to dis-
tribute marijuana, in violation of 21 U.S.C.A. § 841(a)(1). These
offenses are the type of violations that constitute predicate offenses
for purposes of the CCE conviction. 21 U.S.C.A.§ 848(c)(1).[20] Thus,

_____

[19] We previously have held that a Richardson error is not a structural
defect and is subject to harmless error review. United States v. Brown,
202 F.3d 691, 699 (4th Cir. 2000).
[20] The CCE count is charged in the indictment in Count 2. Count 2 pro-
vides that the charged predicate offenses of the CCE are, "knowingly and
intentionally violat[ing] Title 21, United States Code, Sections 841,
843(b) and 846, including, but not limited to, those violations alleged in

32

the jury unanimously agreed that Simms was guilty of more than three predicate offenses that comprise the CCE conviction. Cf. United States v. Stitt, 250 F.3d 878 (4th Cir. 2001) (holding that a CCE conviction was proper under plain error review when Stitt was charged and unanimously found guilty of more than three qualifying predicate offenses). Accordingly, we conclude that the district court's failure to instruct as to the unanimity requirement is not reversible under the plain error test because Simms has failed to establish that he was prejudiced by the error.

2.

Next, Simms argues that his CCE conviction should be reversed because the Government failed to introduce sufficient evidence that Simms acted as an organizer, supervisor, or manager of a CCE. We uphold the jury verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it. United States v. Wilson, 135 F.3d 291, 303 (4th Cir. 1998). The management element is given a "common sense reading," bearing in mind that the statute is intended to reach the leaders of the drug trade. Id. (internal quotations omitted).

Several of Simms' co-conspirators testified that they worked for Simms, who they testified was the head of the drug distribution ring in Virginia. They testified that Simms recruited people into the drug distribution ring, and that Simms gave them instructions regarding how and when to sell the marijuana. Simms also was responsible for choosing the principal supplier of marijuana for distribution. Viewing this evidence in the light most favorable to the Government, it is more than sufficient to support the jury's determination that Simms was an organizer, supervisor, or manager of a CCE involving the predicate offenses of possession with intent to distribute marijuana.

_____

the instant indictment, which are realleged and incorporated by reference herein." (J.A. at 166.) Simms was convicted of violating § 843(b) in Counts 262, 264, 267, and 270 and § 841(a)(1) in Counts 299, 304, 306-07, 311, and 314. Thus, these ten substantive convictions are "violations . . . alleged to be predicate violations constituting the continuing series" and exceed the number of predicate violations required for a CCE conviction. United States v. Brown, 202 F.3d 691, 699 (4th Cir. 2000).

33

3.

Simms also contends that his CCE conviction should be reversed because the Government failed to introduce sufficient evidence that Simms acted in concert with five or more people in furtherance of the CCE. We conclude that substantial evidence supports this element of Simms's CCE conviction.

Co-conspirator Trevor Smith testified that he and several others, including Damion Chambers, Conrad Anglin, Philip Daly, and Claude Jackson, came to Virginia at the request of Simms to aid in the selling and distribution of marijuana. Co-conspirators Crumble and Dixon also testified that they retrieved marijuana packages and sold marijuana under the leadership of Simms. The Government introduced wiretapped conversations in which Crumble and Dixon separately spoke with Simms regarding transfers of marijuana and drug proceeds; each identified their voices. Sean Rainey, Kelvin Thomas, Patrick Crooks, and Terrence Everett all testified that they bought large quantities of marijuana from Simms, which they later resold. Thomas further testified that he had been employed with UPS and that Simms had requested that Thomas ensure that the UPS packages would get to Virginia from California without being intercepted. These facts provide substantial evidence that Simms was acting in concert with five or more people in committing the predicate offenses of possession with intent to distribute marijuana.[21]

_____

[21] In Simms's brief, he argues that if his CCE conviction is sustained, his drug conspiracy conviction under Count 1 must be vacated as a lesser-included offense within the CCE. See United States v. Brown, 202 F.3d 691, 703 (4th Cir. 2000) (noting that a drug conspiracy is a lesser included offense to a CCE charge and that it was error for the district court to impose punishment with respect to both offenses). Because the district court recognized that the drug conspiracy conviction was a lesser-included offense to the CCE, it withheld the imposition of a sentence and assessment with respect to that count. Thus, Simms has not been subjected to "impermissible double punishment." Id. (alteration and internal quotation marks omitted). Accordingly, we find no reversible error.

34

B.

Finally, Simms challenges his sentence with respect to one of his convictions for possession with intent to distribute marijuana on the basis of Apprendi v. New Jersey, 530 U.S. 466 (2000). With respect to Count 314, Simms received a sentence of 240 months, which was imposed concurrently with his sentence of 832 months. Simms contends that because drug quantity was not charged as an element of the offense and found by the jury beyond a reasonable doubt, the maximum statutory term of imprisonment for Count 314 is 5 years, or 60 months. See 21 U.S.C.A. § 841(b)(1)(D). Having failed to raise Apprendi before the district court, we review this challenge for plain error.

The failure to charge drug quantity and type constitutes an error under Apprendi; however, we conclude that the Apprendi error did not affect Simm's substantial rights. To establish that the error affected his substantial rights, Simms must demonstrate that it was prejudicial, i.e., that it "actually affected the outcome of the proceedings." Hastings, 134 F.3d at 240. Thus, Simms must demonstrate that the 240-month sentence that was imposed by the district court was longer than that to which he would otherwise be subject. Pursuant to United States v. White, 238 F.3d 537 (4th Cir. 2001), we conclude that Simms cannot make this showing.

In White, we noted that, "[i]n the case of multiple counts of conviction, the guidelines instruct that if the total punishment mandated by the guidelines exceeds the highest statutory maximum, the district court must impose consecutive terms of imprisonment to the extent necessary to achieve the total punishment." See id. at 543 (citing U.S.S.G. § 5G1.2(d)). Simms was convicted of six counts of possession with intent to distribute marijuana. The district court determined that, under the guidelines, Simms should be held accountable for between 1,000 and 3,000 kilograms of marijuana. After grouping, the guideline range for these offenses was 292-365 months. Assuming that Simms is correct to assert that the statutory maximum for each count is 60 months, to reach the appropriate guideline sentence for that quantity of drugs, the district court would have been obligated to impose the sentences for each substantive drug conviction consecutively until reaching a total sentence of more than 240 months. See

35

White, 238 F.3d at 542 ("[T]he district court would have been obligated to reach that total sentence by imposing a term of imprisonment of 240 months or less on each count of conviction and ordering those terms to be served consecutively to achieve the total punishment mandated by the guidelines."). Accordingly, we decline to notice the Apprendi error with respect to Count 314.

V.

Based upon the foregoing analyses, we vacate Stewart's convictions, sentences, and assessments, we affirm Livingston's convictions and ultimate sentence but remand with instructions for the district court to vacate the convictions, sentences, and assessments attributable to Counts 115-120, and we affirm Simms's convictions and sentences.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED IN PART WITH INSTRUCTIONS

36